UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>LETICIA CASTRO,<br><br>        Defendant. | Case No. 2:15-cr-00064-APG-CWH<br><br>**ORDER**<br><br>**Re: Motion to Revoke Pretrial Release (#40).** |

This matter is before the Court on the Government's Motion for Revocation of Defendant Leticia Castro's Pretrial Release (#40), filed on July 17, 2015. Defendant Castro appeared in Court on July 23, 2015 pursuant to her arrest on a warrant and was detained pending the hearing on the motion to revoke pretrial release. The revocation hearing was conducted on August 3, 2015 during which Defendant presented an extensive argument in opposition to the Government's motion. Following the hearing, the Court granted the Government's request to file a written reply to the Defendant's oral opposition. Defendant filed a written Response to the Government's Motion (#61) on August 7, 2015. The Government filed its Reply (#62) on August 12, 2015.

## BACKGROUND

The indictment in this case charges Defendants Leticia Castro and Jimmy Matute with conspiracy to commit wire fraud, wire fraud, and aiding and abetting in violation of 18 U.S.C. §§ 1349, 1343, and 2. The Government alleges that Defendants engaged in a scheme to fraudulently obtain money from investors by falsely promising to pay them high returns on their investments, by falsely representing that the funds obtained from victims would be used for investment purposes and

by falsely representing that Defendants' company, GrupoMex, LLC, was a legitimate and/or successful investment company. Defendants allegedly made falsely representations that GrupoMex had "'a Master Account Line of Credit (LOC) through its Hedge Fund(s)' and 'substantial equity capital,' which allowed GrupoMex to access exclusive investment programs, called Private Placement Programs (hereafter referred to as PPP's), not otherwise accessible by individual investors." *Indictment (#18), pg. 2*. Defendants allegedly told investors that GrupoMex's access to PPP's would generate astronomically high rates of return for investors with little to no risk of failure. Defendants allegedly used the investors' funds for their personal expenses rather than using them to generate the promised investment profits. The Government alleges that GrupoMex, LLC is a sham company that has never completed a single legitimate transaction. *pgs 1-2*. GrupoMex has not paid any returns to any known investors and has only provided one refund in the amount of $20,000–out of over $3 million that Defendants obtained from victim investors. *pg. 3*. The indictment lists wire transfers of funds from five alleged victims totaling $3,169,323.99. *pgs 4-5*.

      The criminal complaint filed on February 18, 2015 provides additional information regarding the allegations against the Defendants. *Criminal Complaint (#1)*. It alleges that in September 2010, Defendant Castro informed Victim One of a PPP accessible to GrupoMex and its investors that would yield "300% of the invested amount plus a return of principle after 15 days." Victim One invested $1,356,423.99 with GrupoMex, but did not receive the promised return on his investment within 15 days. Nor were any of his funds ever repaid to him. Defendant Castro allegedly provided Victim One with numerous excuses as to why he had not received his money, including that GrupoMex funds were being held in escrow accounts, other people had defrauded GrupoMex, and that GrupoMex was in the process of moving money between accounts. Defendant Matute "eventually informed Victim One that his investment money was used by GrupoMex to pay off 'personal loans,' suggesting to Victim One that his money would not be returned." *Id., pgs 6-8*. Defendants allegedly made similar representations to other victim investors who did not receive the promised profits or the return of their investment funds. *Id., pgs 8-10*. The Government has also attached to its reply brief, an exchange of emails between Defendant Castro and two of the alleged victims investors which illustrate their efforts to obtain the return of their funds. *Reply (#62)*.

Defendant Castro initially appeared in court on February 20, 2015 following her arrest on the criminal complaint. *Minutes of Proceedings (#4).* Based on Defendant's financial condition, the Federal Public Defender was appointed to represent her. Defendant Castro was released from custody on a personal recognizance bond subject to release conditions, including the mandatory condition that she not violate federal, state or local law while on release. The Court imposed the following additional conditions on Defendant: (a) pretrial services supervision; (b) Defendant was required to reside at the half-way house or community corrections center because she did not have a suitable place of residence elsewhere; (c) Defendant was prohibited from employment/self-employment in a setting where she has access to financial transactions or the personal identifiers of others; (d) she was to avoid all contact directly or indirectly with any person who is or may become a victim or potential witness in the investigation, including but not limited to co-defendants; (e) she was prohibited from soliciting money from investors; and (f) she was prohibited from using or possessing any fraudulent monetary instruments, including bonds, access cards, accounts or notes. *Appearance Bond (#13),* filed February 23, 2015.

The Government asserts in its motion to revoke Defendant's pretrial release that at some point after the complaint or indictment was filed, John Salov was appointed GrupoMex's "Managing Director." *Motion (#40), pg. 5.* Mr. Salov is also a creditor of GrupoMex and Defendant Castro. According to two "Corporate/Personal Promissory Notes" executed by Defendant Castro on behalf of GrupoMex in May and June 2012, Mr. Salov initially loaned $10,000 to GrupoMex. He then loaned another $100,000 to GrupoMex. The promissory notes are unusual in that they provide for payment of double the face amount of the loans within 60 business days after they were signed. GrupoMex and Defendant Castro reportedly have not paid any amounts on either note. In contrast to the promissory notes given to Mr. Salov, the documents attached to the Government's reply brief show that the alleged victim-investors entered into written "Joint Venture Agreements" or "Participation Agreements" with GrupoMex which set forth the amount of the investment, the promised percentage rate of return and the date after which such profit and principle would be payable. *Reply (#62-3, 62-5).*

During interviews with federal law enforcement agents in May 2015, Mr. Salov stated that

GrupoMex owns two Freddie Mac bonds that were written by the Morgan Stanley brokerage firm in 1993.  Mr. Salov stated that he has confirmed with Freddie Mac that these are legal financial instruments.  Due to their connection with GrupoMex and/or Defendant Castro, however, the bonds cannot be sold on the bond market trading floor.  Mr. Salov has been informed that the bonds may be worthless, but that they might have a value of up to $3 million.  Mr. Salov persuaded Defendant Castro to give him authority over GrupoMex so that he could attempt to sell the Freddie Mac bonds.  He informed the law enforcement agents that if he is able to sell the bonds, he will deposit the proceeds in an escrow account for the benefit of GrupoMex's creditors, including himself.  Mr. Salov stated that he is not conducting any other business on behalf of GrupoMex and is not soliciting investors for the company.  The law enforcement agents declined to tell Mr. Salov whether his activities with respect to the bonds are legal or illegal.  One of agents cautioned Mr. Salov that what he is attempting to do could be viewed with suspicion by others and that he needed to provides full disclosure to persons with whom he deals.

   On May 21, 2015, Mr. Salov participated in a thirty-one minute telephone conference with Defendant Castro and her two associates, "Kirk" and "Scott," whom Ms. Castro identified as members of GrupoMex's board of directors.  (Defendant disputes that either individual is or was a member of GrupoMex's board.)  Mr. Salov recorded this telephone conversation and subsequently provided the recording to federal law enforcement agents.  The Government submitted the recording of this telephone conference as Exhibit 3 to its motion.  The telephone conference appeared to be initiated by Defendant Castro or one of her associates.  It began with Ms. Castro requesting a status report from Mr. Salov regarding his efforts on behalf of GrupoMex and Ms. Castro.  The first twenty-two minutes of the conference involved a discussion of Mr. Salov's efforts to sell the Freddie Mac bonds and the fact that Ms. Castro has the right of final approval on any sale of the bonds.  In response to a question from Mr. Salov, Ms. Castro stated that she would not approve a sale of the bonds for less than fifty percent of their face value.  (The Court has not been informed of the face value of the bonds.)  There was no specific discussion regarding what would be done with the proceeds if the bonds were sold.  Ms. Castro stated, however, that she was communicating with two private attorneys whom she desired to hire if funds for their fees could be obtained.  Ms. Castro also

indicated her desire to obtain sufficient funds to move out of the half-way house and continue to pay for her cellular telephone.  The implication of the conversation was that if the bonds could be sold, funds would be provided to Ms. Castro to retain the private attorneys and to obtain a place for her to live.  Mr. Salov did not make any statement during this meeting that the sales proceeds would be placed in escrow to pay GrupoMex creditors.  Nor did he state that none of the proceeds would be paid to Defendant Castro or her agents.  Mr. Salov stated that no viable cash offers for purchase of the bonds had been received.  He stated, however, that he expected to receive one or two legitimate offers within the next week or two.

      After the discussion relating to the sale of the bonds was concluded, Defendant Castro's associate "Scott" asked "what monies, if any, could we rustle up for Amy [one of the private attorneys], aka Letty's legal representation."  Scott stated "I've got nothing I can throw your way, unfortunately. So let's . . . deal with what we have right now, if anything."  Scott asked if there were any funds that could be accessed for an attorney for Ms. Castro.  The other individual or associate, "Kirk," stated that he had gone to as many people as he could.  He indicated that only "short term funds," or modest amounts had been obtained.  He stated that raising anything more than $50,000 would be very difficult or complicated because everyone wanted personal guarantees and/or wanted to know what the funds would be used for.  He suggested that the focus should be on selling the bonds to raise funds for the Defendant.  Scott proposed setting up another telephone meeting and proposed that the parties have weekly telephone conferences.  The participants agreed to have another conference call on Thursday, May 28, 2015.

      Ms. Castro then inquired of Mr. Salov about the "interim" and when it would be happening.  She appeared to reference a prior conversation between herself and Mr. Salov.  Mr. Salov stated that he was looking at "smaller money," twenty-five to forty thousand, that they could use to get Defendant and her mom into a place with reliable transportation and some money in her pocket.  Mr. Salov stated that he was working on that today and everyday.  Mr. Salov stated that the discussion of getting money to retain the private attorneys took the matter up to one hundred thousand dollars which created a stumbling block for him.  Defendant Castro responded that what was important for her was keeping her telephone service which she indicated would allow her to accomplish other

things.  Kirk then stated that when "you take it over that forty, fifty mark to a hundred, you lose a lot of different investors and they want a lot more security . . . and they want to know where it's going." Scott stated that any amount that might come in, forty or fifty thousand, would not be enough to hire an attorney, but would be enough to get Defendant into a residence and keep her going.  Defendant Castro agreed with this statement and stated that she "would have to reach out to someone else to see if they can help us with Amy and Ozzie [the two private attorneys]." Defendant Castro further stated that the whole purpose in turning over the bonds was that she needed help with the attorneys. Defendant Castro stated that the whole idea is to help everybody.  She then stated: "I am not going down without a fight. . . .  I am not going to let Jimmy [co-defendant Matute] sink either. . . . I have to protect him in order to protect us. . . . I will get the money somehow, some way, we have to, but working as a team."  Ms. Castro then shifted to asking if there was anyway to pay her phone bill. That was her major concern.  After some further brief discussion, Ms. Castro called the telephone conference to an end.

During his interviews with law enforcement agents, Mr. Salov speculated that Defendant Castro may be attempting to fraudulently raise monies from investors or that she would do so if she was able to get out of the half-way house and set up in a residence where she had full access to telephones.  No evidence was introduced beyond the statements made during the May 21, 2015 telephone conference that Defendant Castro, or others acting on her behalf, have actually solicited monies from investors and, if so, what representations had been made to prospective investors.

## DISCUSSION

A motions to revoke a defendant's pretrial release is governed by 18 U.S.C. §3148(b) which states in relevant part as follows:

> The judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer
>
> (1) finds that there is—
>
> (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or
>
> (B) clear and convincing evidence that the person has violated any other condition of release; and

>    (2) finds that—
>
>    (A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or
>
>    (B) the person is unlikely to abide by any condition or combination of conditions of release.
>
> If there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community. If the judicial officer finds that there are conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, and that the person will abide by such conditions, the judicial officer shall treat the person in accordance with the provisions of section 3142 of this title and may amend the conditions of release accordingly.

As stated in *United States v. Bararia*, 2012 WL 5453673, *4 (D.Nev. 2012), Section 3148(b) provides two alternative grounds for revoking a defendant's pretrial release: (1) probable cause to believe defendant has committed a crime while on pretrial release, or (2) clear and convincing evidence that defendant has violated a condition of her pretrial release. In either circumstance, the Court must determine whether conditions of release can be fashioned to permit the defendant to remain on pretrial release. If there is probable cause to believe that the defendant has committed a felony crime while on pretrial release, then a rebuttable presumption in favor of detention arises.

A.   **Whether There is Probable Cause to Believe that Defendant Committed a Crime While on Pretrial Release.**

The Government argues that there is probable cause to believe that Defendant Castro committed the crime of wire fraud and/or conspiracy to commit wire fraud in violation of 18 U.S.C. 1343 during the May 21, 2015 telephone conference. The Government states that Defendant "agreed and instructed [her associates] to improperly raise money from investors to pay for new attorneys for Defendant Castro and for Defendant Castro's housing and telephone expenses." *Motion (#40), pg. 5*. The Court finds, however, that the statements made by Defendant Castro or others during the May 21, 2015 telephone conference are insufficient to establish probable cause to believe that Defendant committed a crime.

7

As stated in *Bararia*, 2012 WL 5453673, at *5, "'[p]robable cause means 'fair probability, not certainty or even a preponderance of the evidence.' *United States v. Krupa,* 633 F.3d 1148, 1151 (9th Cir.2011) (quoting *United States v. Gourde,* 440 F.3d 1065, 1069 (9th Cir.2006) (en banc)). '[W]hether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a 'commonsense, practical question,' 'for which '[n]either certainty nor a preponderance of the evidence is required.' *Id.* (quoting *United States v. Kelley,* 482 F.3d 1047, 1050 (9th Cir.2007) and *Illinois v. Gates,* 462 U.S. 213, 246 (1983))." Efforts to raise or borrow money from third persons to pay for a defendant's defense or living expenses are not illegal *per se*. The Court understands that the Government suspects that Defendant Castro and her associates intended to engage in fraudulent methods to obtain funds for her benefit. This may be a reasonable suspicion. Absent statements by Defendant or her associates indicating that they intended to use fraudulent or other illegal means to raise funds, however, there is no basis to support a finding of probable cause. Kirk's statement that requests for funds in the forty or fifty thousand dollar range would result in "investors" or lenders wanting personal guarantees and to know what the money would be used for, while again arguably raising suspicions, does not establish probable cause to believe that Defendant or her associates intended to use fraudulent means to raise money for her defense and living expenses.

The Court also finds that Mr. Salov's speculation in his discussions with law enforcement agents about what Defendant Castro was doing or would do if she had full use of a telephone does not support a finding of probable cause. Mr. Salov did not provide the agents with any specific examples of Defendant obtaining or attempting to obtain money by fraudulent means while on pretrial release. The Government therefore has not met its burden under 18 U.S.C. §3148(b)(1)(A).

**B. Whether There is Clear and Convincing Evidence That Defendant Has Violated the Conditions of Pretrial Release.**

The Government argues that the May 21, 2015 telephone conference establishes that Defendant Castro violated the pretrial release condition that she "not solicit money from investors." *See Appearance Bond (#13), pg. 5, item (60).* This condition is broadly worded and is therefore vague to some extent. An "investor" is commonly defined as "one that seeks to commit funds for

8

long term profit with a minimum of risk." *Webster's Third International Dictionary, Unabridged (2002)*. The word "investor" certainly applies to the individuals who allegedly provided money to GrupoMex with the understanding that their funds would be placed in PPP's and that they would receive extraordinarily high profits within a very short period of time. It probably also applies to the loans that Mr. Salov made to GrupoMex and Defendant Castro which provided for the payment of an extraordinary profit or "interest" within 60 days of the execution of the note. Whether the investor condition applies to loans with more traditional or commercially reasonable payment terms, interest rates, and security instruments is doubtful. In this Court's view, this condition is not intended to apply to legitimate loans obtained by a defendant.

The statements made by Defendant Castro's associates Scott and Kirk during the May 21st meeting certainly evidence an intention to seek funds from third persons for Defendant Castro's benefit with a promise of repayment. Kirk specifically referred to such persons as "investors" and discussed their anticipated requests for personal guarantees. Defendant Castro, at minimum, acquiesced in Kirk's and Scott's statements about seeking funds from third persons to pay her legal fees and living expenses. Defendant Castro's statement that "I will get the money somehow, some way" also evidences her intention to obtain the funds from third parties or sources to accomplish her goals. It is not clear from the telephone conference whether funds had already actually been solicited or obtained. Mr. Salov told the law enforcement agents that after Defendant was indicted, he provided monies for the benefit of her mother, but not for the benefit of Defendant. Mr. Salov also made statements during the May 21st telephone conference that he was attempting to raise $25,000 to $40,000 for the benefit of Defendant and her mother. It is not clear, however, that Mr. Salov was being truthful to the Defendant regarding his efforts to raise money on her behalf.

The May 21, 2015 telephone conference clearly evidences Defendant Castro's intention to obtain funds from third persons to fund her legal defense and living expenses. Absent more specific evidence of the representations that were made or would be made to obtain funds on Defendant's behalf, however, the Court is not convinced that this constitutes a violation of the condition that Defendant not seek monies from investors. Nor does the Court believe that finding that the condition was violated, on the basis of this evidence, requires the revocation of Defendant's pretrial

release.

The Government next argues that Defendant Castro violated the condition that prohibits her from employment/self-employment in a setting where she has access to financial transactions or the personal identifiers of others. *Appearance Bond, pg.3, item (29).* This condition would clearly be violated if Defendant Castro attempted to engage in financial transactions with investment clients where she would likely have access to the clients' personal identifying information such as dates of birth, social security numbers, and bank account numbers. This condition would not necessarily be violated, however, by Defendant Castro seeking personal loans from third parties to pay for her defense or living expenses. Ms. Castro's statements during the May 21st telephone conference raise the concern, however, that she believes she is permitted to engage in financial or investment business activity. Defendant's conditions of pretrial release clearly prohibit her from engaging in this type of employment or business activity.

The Government also argues Defendant Castro violated the employment restriction by turning control of GrupoMex over to Mr. Salov. Mr. Salov told the law enforcement agents that his only role in regard to GrupoMex was to attempt to sell the Freddie Mac bonds for the benefit of GrupoMex's creditors, including himself. The sale of the bonds by Mr. Salov was also the focus the May 21st telephone conference with Defendant and her two associates. There is no indication from that conference that Mr. Salov was engaged in other business activity on behalf of GrupoMex, such as the solicitation of new investors. Defendant's conditions of pretrial release do not deprive Defendant Castro of the ownership or control over GrupoMex's assets, including the right to lawfully transfer or sell those assets.[1] Defendant Castro therefore did not violate the release condition by appointing Mr. Salov as GrupoMex's general manager for the purpose of selling the Freddie Mac bonds.

The Government finally argues that Defendant Castro violated the pretrial release condition that she "avoid all contact directly or indirectly with any person who is or may become a victim or

---

[1] Although the caption of the indictment refers a claim for forfeiture under 18 U.S.C. § 981(a)(1)(C), the body of the indictment does not contain any forfeiture allegations regard assets belonging to the Defendants or GrupoMex.

potential witness in the investigation or prosecution, including but not limited to co-defendants." *Appearance Bond, pg.4, item (31).* The Government did not provide Defendant Castro or her counsel with a list of victims or potential witnesses with whom she was precluded from having contact. Such lists are commonly provided to give a defendant clear notice of who she is prohibited from contacting, although such a list is not necessarily required for the condition to be operative and enforceable. The Government argues that Defendant Castro violated this condition by having contact with Mr. Salov who is an alleged victim of the fraudulent scheme, as well as a potential witness. The Government also argues that Defendant's associates, Scott and Kirk, whom she identified as members of GrupoMex's board of directors, are potential witnesses with whom she should have no contact. The Government also argues that Defendant Castro's intention to solicit funds from new investors is likely to create new victims, and therefore violates this condition.

The Government has not shown that Scott and Kirk are, in fact, potential Government witnesses or that Defendant Castro knew or should have known that they are Government witnesses. The Government's allegation that Defendant violated this condition by seeking funds from third parties, who thereupon become victims of the alleged fraud, is speculative and therefore does not constitute clear and convincing evidence that Defendant has violated this condition. Defendant Castro's contacts with Mr. Salov provide the strongest argument that she has violated this condition. Mr. Salov allegedly loaned money to GrupoMex and Ms. Castro which has never been paid. He has also described himself as a victim of the fraud to law enforcement agents. It appears, however, that Mr. Salov voluntarily injected himself into GrupoMex's affairs in effort to sell the Freddie Mac bonds for the benefit of GrupoMex's creditors, including himself. There is no evidence that the Government has attempted to dissuade Mr. Salov from carrying out this activity. Nevertheless, Defendant Castro should have recognized that she is not permitted to have contact with Mr. Salov without approval of the Court or Pretrial Services.

## **CONCLUSION**

The Government has not provided evidence showing that there is probable cause to believe that Defendant Castro has engaged in criminal activity while on pretrial release. The information provided to the Court indicates that Defendant Castro believes it is permissible for her to engage

directly or indirectly in the solicitation of funds from third persons. Given the nature of charges against her, this conduct poses a substantial risk that Defendant will engage in the type of fraudulent conduct that she is charged with in the indictment. The Court is not persuaded, however, that Ms. Castro's alleged violations of her pretrial release conditions require that her release be revoked and that she be detained pending trial. Defendant Castro does need to be further instructed about the requirements of her release conditions. The Court will also impose the additional condition that Defendant shall not solicit or receive gifts or borrow money without the prior authorization of the Court or Pretrial Services. Accordingly,

**IT IS HEREBY ORDERED** that the Government's Motion for Revocation of Defendant Leticia Castro's Pretrial Release (#40) is **denied.**

**IT IS FURTHER ORDERED** that Defendant Leticia Castro be released from custody forthwith, subject to her existing conditions of pretrial release which includes the requirement that she reside at the half-way house or community corrections center. The Court also imposes the additional condition that Defendant Castro shall not solicit or receive gifts or borrow money without the prior authorization of the Court or Pretrial Services. The Court understands that it is possible that Defendant Castro may not be able to return to the half-way house or community corrections center if no bed space is presently available. If that is the case, then her release shall deferred until bed space is available, or the Court authorizes an alternative place of residence.

**IT IS FURTHER ORDERED** that this matter is set for a hearing regarding the status of Defendant's release and the pretrial conditions of release on **Monday, August 24, 2015 at 10:30 A.M. in Courtroom 3A.**

DATED this 18th day of August 2015.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge